Filed 2/28/23  Community Environmental Advocates v. City of Grass Valley CA3
(unmodified opinion attached)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| COMMUNITY ENVIRONMENTAL ADVOCATES et al., | C094613 |
| Plaintiffs and Appellants, | (Super. Ct. No. CU20-084791) |
| v. | ORDER MODIFYING OPINION, DENYING PETITION FOR REHEARING & DENYING REQUEST FOR PUBLICATION |
| CITY OF GRASS VALLEY, | |
| Defendant and Respondent; | |
| RUSSEL JETER, as Trustee, etc., | [CHANGE IN JUDGMENT] |
| Respondent; | |
| R. JETER FAMILY TRUST, | |
| Real Party in Interest. | |

THE COURT:

It is ordered that the opinion filed January 30, 2023, be modified as follows:

1

Delete the last paragraph beginning on page 39 under the heading "DISPOSITION" and insert the following paragraph in its place:

We have concluded that the EIR prepared by the City is an inadequate informational document in that it fails to evaluate adequately the human health effects of residents' exposure to mobile source air pollution. Therefore, we reverse the judgment denying the petition for writ of mandate on this basis, and remand this matter to the superior court with instructions to enter a new judgment granting the petition (in part) and ordering issuance of a peremptory writ of mandate consistent with the requirements of section 21168.9 and this opinion. On remand, the trial court may exercise its discretion to determine whether the severability criteria in subdivision (b) of section 21168.9 are satisfied. Plaintiffs are awarded their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (3).)

This modification changes the judgment.
The petition for rehearing is denied.
The request for publication is denied.

BY THE COURT:

     HULL     , Acting P. J.

     KRAUSE     , J.

     EARL     , J.

Filed 1/30/23 Community Environmental Advocates v. City of Grass Valley CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| COMMUNITY ENVIRONMENTAL ADVOCATES et al., | C094613 |
| Plaintiffs and Appellants, | (Super. Ct. No. CU20-084791) |
| v. | |
| CITY OF GRASS VALLEY, | |
| Defendant and Respondent; | |
| RUSSEL JETER, as Trustee, etc., | |
| Respondent; | |
| R. JETER FAMILY TRUST, | |
| Real Party in Interest. | |

In this action under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), plaintiffs Community Environmental Advocates et al.

1

(plaintiffs) challenge the City of Grass Valley's (City) actions certifying an environmental impact report (the EIR) and approving the Dorsey Marketplace development project (project) proposed by Russel Jeter, as trustee of real party in interest, the R. Jeter Family Trust (Jeter Trust).[1]  The proposed project is a mixed-use development consisting of approximately 104,000 square feet of commercial uses, 8,500 square feet of office space, and 172 multifamily residential units, located on the site of a former mine in Grass Valley, California.

Plaintiffs contend the EIR prepared in connection with the project did not comply with CEQA because it (1) did not accurately describe the project or its environmental setting; and (2) did not identify, analyze, or discuss adequately the project's impacts related to traffic, air quality, noise, water supply, wastewater, hazardous materials, urban decay, protected plant species, and wildfires.  Plaintiffs also contend (3) the findings made in support of the EIR's statement of overriding considerations are not supported by substantial evidence; and (4) the required mitigation monitoring and reporting program lacks sufficient enforcement mechanisms to ensure that the adopted mitigation measures will be implemented.

We agree with plaintiffs that the EIR's air quality analysis is deficient because it does not evaluate adequately State Route (SR) 20/49 as a contributor of mobile source pollution and the associated health risks for future project occupants.  We reject plaintiffs' remaining arguments.  Accordingly, we shall reverse the judgment in part, with instructions to grant the petition for writ of mandate with respect to the EIR's analysis of air quality impacts, and affirm the trial court's order and judgment denying the writ petition in all other respects.

---

[1]     Undesignated statutory references are to the Public Resources Code.  Also, for ease of reference, we will refer to respondents and the real party in interest collectively as the City, except when separate identification is necessary.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *History of the project site*

The proposed project is located on 26.8 acres of undeveloped land within the City of Grass Valley.  The project site is bordered by SR 20/49 to the west, industrial and commercial uses to the south, and the Grass Valley Terrace Apartments to the east.  To the north, separated by Dorsey Drive, are the Springhill Garden Apartments.

The project site is the former location of the Spring Hill Mine, which operated during the late 1800's and intermittently through the 1940's.  Abandoned mine features located on the site include excavations, pits, stockpiles of waste rock, and dry tailings ponds.  Due to the history of mining, the property has been classified as a "brownfield site," meaning that re-use of the property "may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant."  (42 U.S.C. § 9601(39)(A).)  Investigations of the site have revealed the presence of arsenic, lead, mercury, and other potentially hazardous metals.

B.      *Approval of the "Removal Action Work Plan"*

From 2003 to 2007, Holdrege & Kull, an engineering and geology consulting firm, performed investigations of the site for prospective purchasers, including, in 2007, a preliminary geotechnical engineering investigation and report.

In 2008, the Jeter Trust purchased the property.  The Jeter Trust entered into a "voluntary cleanup agreement" with the California Department of Toxic Substances Control (DTSC) to investigate and remediate hazardous substances at the site.

On behalf of the Jeter Trust, Holdrege & Kull prepared a preliminary endangerment assessment (PEA) report for the DTSC's review and approval.  The PEA was based on the understanding that a commercial development was proposed for the site.  At the time, neither an EIR nor a tentative map for the project had been submitted to the City.

A human health risk assessment was performed as part of the PEA. The PEA recommended that the mine waste in the former mill area be excavated and removed, and that the mine waste outside the former mill area be consolidated and buried beneath the proposed commercial development. The DTSC approved the PEA in February 2008.

Based on the findings in the PEA, Holdrege & Kull prepared and submitted to the DTSC a draft removal action work plan (RAW). (Health & Saf. Code, § 25323.1.) The purpose of the RAW was to describe procedures for remediating the hazardous environmental conditions at the site. The RAW describes the onsite contamination, the proposed remedial criteria, the plan for achieving remediation, as well as procedures to confirm that the remedial criteria are achieved. The DTSC provided comments on the draft, and a final RAW was submitted to the DTSC in June 2012.

The final RAW identified two areas of concern (AOC's) for remediation. The former mill area was identified as AOC 1, and the remaining mine waste area (generally located to the west of the mill) was identified as AOC 2. The RAW identified two separate strategies for remediation of AOC 1 and AOC 2 based on the results of the human health risk assessment and an evaluation of local background soil concentrations. As recommended in the PEA, the mine waste within AOC 1 would be excavated and removed from the site, and the waste in AOC 2 would be consolidated and buried beneath the proposed development. An estimated 1,700 cubic yards (150 truckloads) of mine waste rock, tailings, and affected soil would be removed from the former mill area and transported to a waste disposal facility. From the remaining waste area, an estimated 64,000 cubic yards of contaminated mine waste and affected soil would be excavated, consolidated, buried on site, covered with 10 feet of clean soil, and then capped with either the foundations of a building or a parking lot. Prior to implementation of the RAW, the DTSC must review and approve the final site development plans showing the onsite placement details.

4

The RAW requires verification soil sampling after excavation and placement of the mine waste to confirm that the remedial goals are achieved. The RAW also requires a deed restriction to ensure that the mine waste within the onsite placement area is not disturbed in the future.

The DTSC determined that the RAW was "categorically exempt" from CEQA under section 15330 of chapter 3 of division 6 of title 14 of the California Code of Regulations, pertaining to minor cleanup actions. (The regulations found in title 14 of the California Code of Regulations, section 15000 et seq., are hereinafter referred to in this opinion as the "CEQA Guidelines.") The final RAW and a proposed CEQA notice of exemption underwent a 30-day public comment period from August 8, 2013, to September 9, 2013. On November 12, 2013, the DTSC approved the RAW and directed that the notice of exemption and approval of the RAW be published in the local newspaper.

C.       *The proposed development project*

In 2014, the Jeter Trust applied to the City's "Development Review Committee" for conceptual review of a preliminary site plan for a proposed shopping center on the property. The initial proposal was for a 215,250-square-foot commercial retail development.

In late 2015, the Jeter Trust submitted a formal application for the project. The proposed project, as revised, was a mixed-use development consisting of approximately 179,000 square feet of commercial uses with 90 multifamily residential units. Subsequently, the Jeter Trust developed an alternative site plan, further reducing the proposed commercial space to approximately 104,000 square feet, while increasing the multifamily residential to 172 units, and adding 8,500 square feet of office space. The alternative site plan came to be known as "Alternative B," while the original site plan came to be known as "Alternative A."

5

To comply with CEQA, in March 2019, the City prepared and released for public comment a draft EIR for the project. According to the draft EIR, the objectives for the proposed project included: redeveloping the property to allow for the environmental clean-up of the former mining site; creating a high-quality mixed-use infill project through the re-use of an existing brownfield site; creating new quality high-density market-rate housing to help satisfy the City's regional housing needs; and creating new retail uses that will capture more local sales tax dollars and reduce the amount of "sales tax leakage," while reducing vehicle miles traveled, air quality impacts, and greenhouse gas (GHG) emissions.

The draft EIR evaluated the environmental impacts of the two project alternatives, Alternative A and Alternative B, at an equal level of detail. It identified potentially significant environmental impacts on land use, aesthetics, biological resources, cultural resources, transportation, noise, air quality, climate change, geology, and hazardous materials. The City received 17 letters commenting on the draft environmental analysis.

In or about November 2019, the City released its final EIR. The final EIR contained revisions to the draft EIR and written responses to comments received on the draft EIR. The final EIR concludes that all the project's potentially significant impacts will be reduced to a less-than-significant level through implementation of feasible mitigation measures, except for two significant and unavoidable impacts on transportation (for Alternative A only) and climate change.

At its December 3, 2019 meeting, the planning commission recommended that the city council certify the EIR, adopt findings of fact, a statement of overriding considerations, and a mitigation monitoring and reporting program (MMRP), and approve project Alternative B. In April 2020, the city council adopted the planning commission's recommendation and related project approvals. In so doing, the City found that the project would provide eight significant benefits sufficient to justify approval of

6

the project despite a significant and unavoidable climate change impact. The City filed its notice of determination for the project on April 29, 2020.

On August 3, 2020, plaintiffs filed this action seeking a peremptory writ of mandate invalidating the City's certification of the EIR and approval of the project. A hearing on the merits was held on March 26, 2021. Following the hearing, the trial court issued an order and judgment denying the writ petition. Plaintiffs timely appealed. Briefing was completed in this court on June 14, 2022.

DISCUSSION

I

*Standard of Review*

We review an agency's compliance with CEQA for prejudicial abuse of discretion. (*California Coastkeeper Alliance v. State Lands Com.* (2021) 64 Cal.App.5th 36, 55.) Abuse of discretion is shown if the agency has not proceeded in the manner required by law, or the determination is not supported by substantial evidence. (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1105.) " ' "Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." ' " (*We Advocate Thorough Environmental Review v. County of Siskiyou* (2022) 78 Cal.App.5th 683, 691.)

Under CEQA, " '[s]ubstantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." ' " (*Center for Biological Diversity v. Department of Forestry & Fire Protection* (2014) 232 Cal.App.4th 931, 941; CEQA Guidelines, § 15384.) In determining whether an agency's determination is supported by substantial evidence, our task is not to weigh conflicting evidence and determine who has the better argument. (*Friends of College of San Mateo*

7

*Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 953.) We must indulge all reasonable inferences from the evidence in favor of the agency's decision. (*Center for Biological Diversity, supra*, at p. 941.) We may reverse an agency's determination only if no reasonable person could have reached the same conclusion based on the same evidence. (*Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 922.)

II

*Project Description*

We first consider whether the EIR is flawed because it contains an inaccurate and unstable description of the project.

The role of an EIR as an informational document is to identify and describe the effects that a proposed project is likely to have on the environment and to consider ways in which the significant effects may be eliminated or reduced through feasible mitigation measures and project alternatives. (§§ 21002.1, subd. (a), 21061, 21080, subds. (a) & (d), 21100; see also § 21002.) In this manner, the EIR acts "as an environmental 'alarm bell,' " alerting the public and responsible officials to environmental changes "before they have reached ecological points of no return." (*County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810.)

Under CEQA, a project is defined as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.) The term "project" is given a broad

interpretation to maximize protection of the environment. (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1223.)

To comply with CEQA, an EIR's description of the project must be accurate, stable, and complete. (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-193; *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332 (*South of Market*).) " 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, . . . and weigh other alternatives in the balance.' [Citation.]" (*South of Market, supra*, at p. 332; accord, *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1448.) A curtailed, enigmatic, or unstable project description "that gives conflicting signals to decision makers and the public about the nature of the project is fundamentally inadequate and misleading." (*South of Market, supra*, at p. 332.) The EIR must describe the main features of the project in "sufficient detail to enable the public and decisionmakers to understand the environmental impacts of the proposed project." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 36; CEQA Guidelines, § 15124.)

An EIR's description of the project must include the "whole of an action" proposed to be carried out or approved. (CEQA Guidelines, § 15378, subd. (a); § 21080, subd. (a); see *Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 695, 696 [project is broadly defined to maximize protection of the environment].) "CEQA forbids 'piecemeal' review of the significant environmental impacts of a project." (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs*. (2001) 91 Cal.App.4th 1344, 1358.) A lead agency may not split a larger project into smaller pieces to avoid evaluating the environmental impacts of the entire project. (*Id.* at p. 1357; accord, *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 293; see *City of Santee v. County of San Diego*

9

(1989) 214 Cal.App.3d 1438, 1452 [the danger in filing separate environmental documents for the same project is that consideration of cumulative impacts will not occur].)

Whether an EIR correctly describes a project is a question of law. (*South of Market, supra*, 33 Cal.App.5th at p. 332.) In this case, we conclude that the EIR's project description is legally adequate.

In reaching this conclusion, we begin by acknowledging that " '[t]he distinction between elements of a project and measures designed to mitigate impacts of a project may not always be clear.' " (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 206 (*Mission Bay Alliance*); see CEQA Guidelines, § 15370 [defining mitigation].) If a project will have a significant effect, one way to comply with CEQA is to incorporate changes or alterations into the project to avoid or substantially lessen the significant effect. (CEQA Guidelines, § 15041, subd. (a).) It is not surprising, therefore, that courts have struggled to distinguish between the remedial elements of a project and measures designed to mitigate impacts of the project. (*Mission Bay Alliance, supra*, at pp. 184-185; *Citizens for Environmental Responsibility v. State ex rel. 14th Dist. Ag. Assn.* (2015) 242 Cal.App.4th 555, 569-572; *Save the Plastic Bag Coalition v. City and County of San Francisco* (2013) 222 Cal.App.4th 863, 882-883; see CEQA Guidelines, § 15126.4, subd. (a)(1)(A).)

In this case, the dispute concerns whether the RAW is a component of the project, as plaintiffs contend, or a mitigation measure, as the City asserts. This is a difficult question to answer since, in our view, the RAW has elements of *both* a mitigation measure *and* a component of the project.

On one hand, the RAW appears to be a critical component of the development project. The EIR acknowledges that the project site contains hazardous materials because of past mining activities and explains that "[t]hese conditions must be remediated to make the site safe for human use." The EIR identifies "clean-up" of the brownfield site

10

as a project objective, and states that, "[u]nder either alternative, the project would include implementation of the RAW" to "prepare the site for building construction." Implementation of the RAW was expressly contingent on the City's approval of a development project. And the RAW expressly provides that remediation of the site will coincide with development.

In this sense, the case fits squarely into the category of cases in which the reviewed project "legally compels or practically presumes completion of another action." (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1223; see *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143-1147 [project description must include actions that will be taken to clean up and dispose of existing environmental contaminants on acquired site], disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 569-570 & fn. 2; see also *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 729-730 [sewer expansion improperly segmented from residential development project]; *Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora, supra*, 155 Cal.App.4th at p. 1231 [proposed road realignment improperly segmented from commercial development project]; *Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 269-273 [proposed mining operations and reclamation plan constituted a single project].)

On the other hand, as the City argues, the RAW clearly is a remedial measure. Without the RAW, the proposed project would disturb and displace the existing contaminated soil, a direct physical change that could negatively affect human health. (See *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 389 (*CBIA*) [project may have potentially significant exacerbating effect by dispersing existing environmental contamination]; *Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 332 [project may have a significant environmental impact by disturbing

11

contaminated soils]; § 21083. subd. (b)(3).)  The purpose of the RAW is to remediate the potential health hazards associated with the presence of environmental contamination at the project site.

An important distinction here, however, is that it is the DTSC, not the City, that has the authority to approve the RAW, and the DTSC already has done so, under a categorical CEQA exemption in 2013.  (Health & Saf. Code, § 25356.1.)  To the extent plaintiffs seek to challenge the DTSC's approval, the City correctly argues that their challenge comes too late.  (CEQA Guidelines, §§ 15002, subd. (k)(1), 15062, subd. (d); *California Farm Bureau Federation v. California Wildlife Conservation Bd*. (2006) 143 Cal.App.4th 173, 190.)  Once approved, the RAW became a regulatory remedial measure to be applied to the development project.  But it was not a component of the project over which the City had discretionary approval authority.  (*Citizens for East Shore Parks v. State Lands Com*. (2011) 202 Cal.App.4th 549, 565 [not piecemealing to exclude refinery from project description where it required no approvals for continued operations]; *San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 937-940 [city not required to prepare a subsequent or supplemental EIR to consider the effects on climate change as part of design review approval process for project that was already approved by city]; CEQA Guidelines, § 15378, subd. (c).)

We conclude that the EIR's project description fairly reflects this unique factual posture.  The EIR explains that the site contains hazardous materials, that the DTSC approved the RAW to remediate the potential health hazards from the hazardous materials, and that the project will include implementation of the previously approved RAW to remediate the potential health hazards and prepare the site for construction.  The EIR sufficiently informed decision makers and the public that the RAW is an existing remediation measure that will be implemented as part of the project to mitigate the expected impacts from hazardous waste contamination.  Further, the approved RAW, and all the information considered by the DTSC before approving the RAW, is attached to

12

and summarized in the EIR.  We therefore conclude that the EIR's project description was legally adequate.

Moreover, this was not a situation in which the City sought to use improper segmentation to conceal or ignore adverse environmental effects of the project.  The EIR concluded that the project, without mitigation, would have a potentially significant impact.  The EIR proposed implementation of the RAW as mitigation to reduce that impact to less than significant.  Plaintiffs have not cited any evidence to suggest there will be significant environmental effects despite implementation of the RAW, or that the EIR failed to disclose any adverse environmental effects of implementing the RAW.  Thus, even if the EIR's description of the project somehow mischaracterized the RAW, it was not prejudicial.  (*Mission Bay Alliance, supra*, 6 Cal.App.5th at p. 185 ["Any mischaracterization is significant . . . only if it precludes or obfuscates required disclosure of the project's environmental impacts and analysis of potential mitigation measures"].)

Accordingly, we reject plaintiffs' challenge to the EIR's project description.  Plaintiffs' related argument that the EIR failed to analyze adequately the impacts resulting from implementation of the RAW is specifically addressed below.

III

*Environmental Baseline*

In determining whether a project's impacts are significant, an EIR ordinarily compares those impacts with the existing environmental conditions in the vicinity of the project, which is referred to as the "environmental baseline."  (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 615; CEQA Guidelines, § 15125.)  The baseline normally reflects the physical conditions existing at the time the notice of preparation is published or, if there is no notice of preparation, at the time the environmental analysis begins.  (*San Franciscans, supra*, at p. 615; CEQA Guidelines, §§ 15125, subd. (a)(1), 15126.2, subd. (a).)

13

Plaintiffs assert that the City's EIR contains an inadequate environmental baseline because it fails to describe adequately the existing physical environmental conditions in the vicinity of the project. However, plaintiffs have failed to support this claim with reasoned argument or proper citations to the record explaining *how* and *why* the EIR's baseline is inadequate. Accordingly, we deem this contention forfeited. (*Singh v. Lipworth* (2014) 227 Cal.App.4th 813, 817.)

IV

*Analysis of Specific Environmental Impacts*

We next consider plaintiffs' claim that the EIR failed to analyze or mitigate adequately the impacts of the project on hazardous materials, traffic, air quality, noise, water supply, wastewater, urban decay, protected plant species, and risk of wildfire.

A.  *Legal background*

The purpose of an EIR is to provide decision makers and the public with detailed information about the physical effects the proposed project is likely to have on the environment, to list ways in which the significant effects of the project might be minimized, and to identify alternatives to the project. (§§ 21002.1, subd. (a), 21061, 21100, subd. (b); CEQA Guidelines, § 15378.)

In reviewing the adequacy of an EIR's discussion of environmental impacts, we do not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informational document. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392.) An agency has considerable discretion to decide the manner in which potentially significant effects are discussed. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515 (*County of Fresno*).) An EIR's evaluation need not be exhaustive, and we require neither technical perfection nor scientific certainty. (*Ibid.*; *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1396 [the fact that additional studies might be helpful does not mean that they are required].) " ' "[T]he adequacy of an EIR is

14

determined in terms of what is reasonably feasible, in light of factors such as the magnitude of the project at issue, the severity of its likely environmental impacts, and the geographic scope of the project." ' " (*Rodeo Citizens Assn. v. County of Contra Costa* (2018) 22 Cal.App.5th 214, 226.) The ultimate inquiry is whether the EIR includes enough relevant information to enable those who did not participate in its preparation to understand and consider meaningfully the issues raised by the proposed project. (*County of Fresno, supra*, at p. 516; CEQA Guidelines, § 15151.)

Where an agency's discussion implicates a factual determination, such as the selection of a threshold of significance or the methodology used to study an impact, a more deferential standard is employed. (*County of Fresno, supra*, 6 Cal.5th at p. 516.) We are bound by the agency's determination if it is supported by substantial evidence. (*Id.* at p. 512; *Mission Bay Alliance, supra*, 6 Cal.App.5th at p. 206; *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 642.)

An EIR must discuss cumulative impacts when the project will make a " 'cumulatively considerable' " incremental contribution to a significant cumulative effect. (CEQA Guidelines, § 15130, subd. (a).) "Cumulative impacts are defined as 'two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.' [Citation.]" (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1030 (*Sacramento Old City*).) A project's incremental contribution is cumulatively considerable if it is "significant when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects." (CEQA Guidelines, § 15065, subd. (a)(3).) When making this determination, an EIR may not conclude that a cumulative impact is insignificant solely because its incremental contribution to a cumulative effect is relatively small. (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1024-1025.) Conversely, an EIR is not required to conclude that any

15

incremental contribution to an existing significant impact, no matter how small, must be treated as cumulatively considerable. (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 119, overruled in part on other grounds in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, fn. 3.) The relevant question is "not how the effect of the project at issue compares to the preexisting cumulative effect, but whether 'any additional amount' of effect should be considered significant in the context of the existing cumulative [condition]." (*Communities for a Better Environment, supra*, at p. 120.)

Once a project's potentially significant environmental impacts have been identified, the EIR must propose and describe mitigation measures to reduce or avoid those effects. (§§ 21002, 21002.1, subds. (a) & (b), 21061, 21100, subd. (b)(3); CEQA Guidelines, §§ 15121, subd. (a), 15126.4, subd. (a)(1).) Before approving a project, the lead agency must adopt any feasible mitigation measures identified in the EIR that would mitigate, avoid or lessen the project's significant environmental impacts. (§§ 21002, 21002.1, subd. (b), 21081, subd. (a); CEQA Guidelines, §§ 15021, subd. (a), 15091, subd. (a).)

Mitigation measures generally should describe the specific actions that will be taken to reduce or avoid an impact. (*Sacramento Old City, supra*, 229 Cal.App.3d at p. 1027.) Formulation of mitigation measures generally may not be deferred to the future. (CEQA Guidelines, § 15126.4, subd. (a)(1)(B).) However, an agency may defer formulation of specific mitigation measures until after project approval when it is impractical or infeasible to include those details during the project's environmental review and the agency identifies specific performance standards the mitigation will achieve and commits to devising measures that will satisfy those criteria. (*Sacramento Old City*, at pp. 1028-1029; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275-1276; *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 915-916; CEQA Guidelines, § 15126.4, subd. (a)(1)(B).)

16

Compliance with relevant laws or regulations may serve as adequate mitigation if it is reasonably expected to reduce the impact to a specified performance standard. (CEQA Guidelines, § 15126.4, subd. (a)(1)(B); *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906 (*Oakland Heritage*); *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 933.) Assessment of a fee also is an appropriate form of mitigation if it is linked to a specific mitigation plan or program designed to address a cumulative impact. (CEQA Guidelines, §§ 15064, subd. (h)(3), 15130, subd. (a)(3); *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 139-140 (*Save Our Peninsula*).) Any fee assessed must be "roughly proportional" to the project's incremental contribution to the cumulative environmental problem. (CEQA Guidelines, § 15126.4, subd. (a)(4)(B); *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1040.)

Mitigation measures either must be incorporated into the design of the project or be otherwise enforceable through conditions, agreements, or other measures. (§ 21081.6, subds. (a)(1) & (b); *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1261-1262.) If a proposed mitigation measure would itself cause significant environmental impacts, those effects also must be discussed in the EIR, albeit in less detail than the project's significant effects. (CEQA Guidelines, § 15126.4, subd. (a)(1)(D); *Save Our Peninsula, supra*, 87 Cal.App.4th at p. 130.)

B.      *Hazardous materials*

Plaintiffs contend that the EIR's analysis of hazardous materials violates CEQA because (1) the EIR improperly deferred analysis of the RAW's impacts; and (2) the City failed to retain proper oversight over the RAW's implementation. Neither argument has merit.

As discussed above, the DTSC, not the City, is the agency with statutory authority to prepare or approve remedial action plans. (Health & Saf. Code, § 25356.1; *City of Lodi v. Randtron* (2004) 118 Cal.App.4th 337, 352.) Consistent with that authority, the

17

DTSC approved the RAW in 2013. After approval, the RAW remains subject to DTSC oversight and enforcement. (See *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 412.) In addition, the City has committed to monitoring compliance with the RAW through its mitigation monitoring and reporting program, or MMRP. Thus, the RAW will be enforced by the DTSC under its oversight authority and by the City through its MMRP. Accordingly, the City did not improperly defer oversight of the RAW to the DTSC.

The efficacy of the remediation activities was reviewed by the DTSC when it approved the RAW in 2013. To the extent plaintiffs seek to challenge the DTSC's analysis and conclusions, plaintiffs are too late. Health and Safety Code section 25356.1, subdivision (g) required any action seeking judicial review of the approved RAW to be filed within one year of the approval.

In any event, the City complied with CEQA's informational requirements by disclosing the RAW (and related information) in the EIR. The EIR provides a general description of the project vis-à-vis its status as a "brownfield site." The EIR explains that without implementation of the RAW, the project could have a potentially significant hazardous materials impact. The EIR further discloses that the RAW, a previously approved remediation plan, will be implemented to remediate the potential human health risks posed by the existing contamination. As explained in the EIR, implementation of the RAW will be subject to the DTSC's oversight and approval, and the City will monitor compliance as part of its MMRP.

The RAW, appended to the EIR,[2] establishes specific remediation criteria designed to protect human health. The RAW explains that the criteria were based on an

---

[2] While the use of an appendix to present information is disfavored, it can satisfy CEQA if the appendix is referenced in the text of the EIR and the discussion in the

18

evaluation of local background levels, applicable federal and state environmental laws, and the results of a human health risk assessment.

The EIR explains how the RAW would mitigate the potential impact to a less-than-significant level. Specifically, under the RAW, mine waste and affected soil will be cleaned to background levels and either excavated and removed from the site or consolidated and buried beneath the proposed development in an onsite containment area that is not subject to surface water infiltration or groundwater seepage. The RAW includes verification soil sampling to confirm that the remedial goals will be achieved, and a deed restriction to ensure that the contaminated soil buried on site will not be disturbed in the future. Indeed, the very purpose of the RAW is to remediate any potential health hazards and make the site safe for human use and occupation. (Health & Saf. Code, §§ 25323.1, 25356.1.)

While the PEA's human health risk assessment did not consider a residential exposure scenario, plaintiffs have failed to cite any evidence to suggest that the cleanup measures and performance criteria in the RAW would not be protective of future residential uses. There is substantial evidence to show it would. Under the RAW, soil verification sampling would ensure that former mine waste locations outside the onsite containment area would meet remedial goals and be suitable for "unrestricted land use," which includes residential uses. In addition, the RAW states that the onsite containment and offsite disposal would protect human health by "eliminating potential exposure pathways (incidental ingestion, inhalation of airborne particulates, and dermal contact with the impacted soil)."

The EIR did not improperly defer analysis of the RAW. (*City of Maywood v. Los Angeles Unified School Dist., supra*, 208 Cal.App.4th at pp. 402-413 [no CEQA violation

_____

appendix is adequate. (Cf. *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219, 1239.)

19

where school district conducted a preliminary investigation of existing contamination and committed itself to fully remediate the site by completing a RAW under the supervision of the DTSC]; see *Oakland Heritage, supra*, 195 Cal.App.4th at p. 906 [details of mitigation can be deferred if agency commits itself to devising measures that will satisfy specific performance criteria]; *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1357 [compliance with environmental laws mitigated impacts of potential effect on surface and ground water].) The EIR's analysis of hazardous materials included sufficient information to permit decision makers to make an intelligent judgment about the potential environmental impacts of the project and the RAW. The information in the RAW is substantial evidence supporting the EIR's conclusion that hazardous materials impacts resulting from remediation activities would be reduced to a less-than-significant level. For these reasons, we reject plaintiffs' challenge to the EIR's analysis of hazardous materials impacts.

C. *Traffic*

Plaintiffs contend that the EIR's analysis of traffic impacts is deficient because it (1) includes information that is inconsistent with the City's "Traffic Impact Analysis Report"; and (2) fails to provide adequate information to determine whether a proposed "fair-share mitigation fee" will reduce the project's traffic impacts to a less-than-significant level. In response, the City argues that plaintiffs' traffic-related contentions are moot because automobile delay is no longer considered a significant environmental impact. We agree that plaintiffs' contentions are moot.

Plaintiffs' arguments relate to traffic impacts at the intersection of Idaho Maryland Road and Brunswick Road (referred to as "Intersection 12"). The EIR concluded that, under either alternative, traffic generated by the project would contribute to existing unacceptable levels of service at Intersection 12. As mitigation, the EIR proposed (1) construction of an improved concrete "porkchop" barrier to control eastbound drivers; and (2) payment of a traffic impact fee to fund the applicant's fair-share contribution

toward signalization of the intersection, consistent with the City's capital improvement program. The EIR concluded that, with mitigation, the identified traffic impacts would be less than significant.

In late 2018, the Natural Resources Agency adopted revisions to the CEQA Guidelines that set forth criteria for evaluating a project's transportation impacts. (*Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1021 (*Ocean Street*).) Effective July 1, 2020, the CEQA Guidelines provide that, except for roadway capacity projects, "a project's effect on automobile delay shall not constitute a significant environmental impact." (CEQA Guidelines, § 15064.3, subd. (a); see § 21099, subd. (b)(1).)

Under current law, the project's effect on traffic levels of service is not a significant environmental impact. (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 625.) Plaintiffs concede this point. It follows that even if we were to conclude that the EIR's level-of-service based traffic analysis was flawed or inadequate, we could not order the City to conduct such an analysis on remand. Accordingly, we conclude, as we did in *Citizens for Positive Growth*, that plaintiffs' traffic impact arguments are moot. (*Ibid*.; accord, *Ocean Street, supra*, 73 Cal.App.5th at p. 1021; see *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 755, fn. 29.)

In addition to the project's level-of-service based traffic impacts, plaintiffs argue in passing that the EIR should have evaluated the extent to which traffic caused by the project will impact GHG emissions. However, the entire argument consists of a single sentence, without a separate heading, and plaintiffs failed to support the argument with any meaningful analysis or citations to the record. The argument is therefore forfeited. (*Citizens for Positive Growth & Preservation v. City of Sacramento, supra*, 43 Cal.App.5th at pp. 629-630; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.) Plaintiffs do not challenge any other part of the transportation

21

impacts analysis. Consequently, to the extent it is not moot, we conclude that the EIR's transportation analysis complies with CEQA.

    D.      *Air Quality*

Plaintiffs challenge the EIR's analysis of air quality impacts because it (1) does not evaluate adequately SR 20/49 as a source of hazardous automobile emissions and the associated health risks for future project occupants; and (2) provides no meaningful analysis of the risks from naturally occurring asbestos. We reject the latter contention but agree that the former has merit.

    1.      *Mobile source emissions*

Based on guidance in appendix G of the CEQA Guidelines, the EIR determined that the project would have a significant impact on air quality if it would (1) conflict with or obstruct implementation of an applicable air quality plan; (2) violate any air quality standard or contribute substantially to an existing or projected air quality violation; (3) result in a cumulatively considerable net increase of any criteria pollutant for which the region is in "non-attainment"; (4) expose sensitive receptors to substantial pollutant concentrations; or (5) create objectional odors affecting a substantial number of people. Using the "CalEEMod" land use and emissions modeling program, the EIR estimated the air pollutant emissions that would be generated during construction and operation of the proposed project. The EIR then compared those estimated emissions to the significance criteria established by the Northern Sierra Air Quality Management District (NSAQMD) to achieve and maintain national and state ambient air quality standards. The EIR also considered a state list of toxic air contaminants, a federal list of hazardous air pollutants, and the California Air Resources Board's "Air Quality and Land Use Handbook: A Community Health Perspective" (CARB Handbook).

The EIR concluded that, before mitigation, the project could cause or contribute substantially to an existing or projected air quality violation, a potentially significant impact. However, the EIR proposed mitigation measures and concluded that the

measures would reduce the impacts to a less-than-significant level.  The EIR concluded that the project's other air quality impacts would be less than significant without mitigation.

Plaintiffs contend the EIR is flawed because, even though the project site is bordered by SR 20/49, the EIR ignored SR 20/49 as an emissions source.  Plaintiffs argue that the City should have prepared a health risk assessment to evaluate the human health risks to sensitive receptors at the project site due to its proximity to SR 20/49.

The City claims the EIR discussed adequately the potential air quality impacts of the project.  Relying on *CBIA, supra,* 62 Cal.4th 369, the City contends that pollution exposure reduction strategies were incorporated into the project and the air quality impacts of existing traffic on SR 20/49 were properly treated as components of the existing environment, not impacts of the project required to be analyzed in the EIR.  We find the City's reliance on *CBIA* misplaced.

The issue in *CBIA* was whether thresholds of significance for "new receptors" adopted by the Bay Area Air Quality Management District (the district) were invalid because they required analysis of how existing environmental conditions would impact a proposed project's future residents or users.  (*CBIA, supra*, 62 Cal.4th at pp. 378-380.)  After the Court of Appeal upheld the thresholds, our Supreme Court granted review to decide under what circumstances, if any, CEQA requires an analysis of how existing environmental conditions will impact future residents or users of a proposed project.  (*CBIA*, at pp. 380-381.)

The Supreme Court concluded that CEQA does not *generally* require an evaluation of how existing hazards or conditions might impact future residents or users of a proposed project.  (*CBIA, supra*, 62 Cal.4th at p. 377.)  However, the Supreme Court also recognized exceptions to this general rule.  (*Id*. at pp. 391-392.)  One such exception applies when a proposed project risks exacerbating existing environmental hazards.  The court held that when a proposed project risks *exacerbating* environmental hazards or

23

conditions that already exist, the agency must analyze the potential impact of such hazards on future residents or users. (*Id.* at pp. 377, 388; accord, *League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 136 ["CEQA requires an EIR to analyze 'any significant environmental effects the project might cause or risk exacerbating by bringing development and people into the area affected' "]; CEQA Guidelines, § 15126.2, subd. (a).)

The City argues that the EIR did analyze whether the project's contribution to traffic to SR 20/49 could exacerbate existing hazards associated with mobile source pollution. Relying on the CARB Handbook, the City argues the EIR concluded there was no evidence that the project would create a new health risk or substantially exacerbate any existing significant health risks to existing or future residents. We take no issue with the City's reliance on the CARB Handbook as a threshold of significance, but we conclude it was misapplied here.

According to the CARB Handbook, air pollution studies indicate that living close to high traffic roadways may lead to adverse health effects, including asthma and reduced lung function. A key observation in the studies is that proximity to the roadway, truck traffic densities, and local meteorology (wind patterns) were key factors affecting the strength of association with adverse health effects. The studies reported an association of adverse health effects with proximity to traffic-related emissions within 1,000 feet, with the strongest association within 300 feet, and a 70 percent drop off in particulate pollution levels at 500 feet. Based on these studies, the CARB Handbook recommends against siting new residences and other sensitive receptors within 500 feet of a freeway, urban roads with 100,000 vehicles per day, or rural roads with 50,000 vehicles per day.

Under Alternative B, the nearest residences in the proposed project would be sited about 170 feet from the SR 20/49 travel lanes, well within the 500-foot recommended buffer. The City nevertheless determined that a detailed health risk assessment was not required. Because total traffic volume on SR 20/49 was below the rural significance

24

threshold of 50,000 vehicles per day, the City concluded "there [was] no significant health risk that the project could exacerbate."

Other information in the EIR, however, shows that the average daily traffic volume for SR 20/49 is expected to increase to 56,000 vehicles by 2035, and that the proposed project would add an additional 1,000 daily vehicle trips to that total.[3]  Thus, the total traffic volume would exceed the 50,000-daily-vehicles threshold described in the CARB Handbook under existing-plus-project future conditions.  Future residents of the project would be exposed to substantial concentrations of toxic air contaminants associated with SR 20/49.

It follows that SR 20/49 is a potentially significant source of hazardous automobile emissions that the proposed project risks exacerbating.  As a result, the project's potentially significant exacerbating effects should have been evaluated in the EIR.[4]

Since the EIR failed to evaluate the potential impact of such emissions on future residents and users, the EIR did not contain sufficient analysis to enable those who did not participate in its preparation to understand and meaningfully consider the extent to which the project could adversely affect the health of the project's occupants.  (*County of Fresno, supra*, 6 Cal.5th at pp. 515-516, 518-520; see *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs., supra*, 91 Cal.App.4th at p. 1370 [" 'agency must use its best efforts to find out and disclose all that it reasonably can,' " italics omitted].)

---

**3** At oral argument, the City objected that the information on future average daily traffic volume was taken from the "Noise" section of the EIR.  However, this is the same data on which the City relied to argue that a health risk assessment should not be required.

**4** We acknowledge that the EIR analyzed the potential health impacts from the construction-related emissions of toxic air contaminants.  Plaintiffs do not challenge this part of the EIR.

The fact that the project design incorporates certain strategies to minimize exposure to toxic air contaminants does not alter this conclusion. The EIR does not give any sense of the nature or magnitude of the potential health risks posed by the project's proximity to SR 20/49, or the relative effectiveness of the pollution reduction strategies. The draft EIR did not even mention SR 20/49 as a potential emission source, let alone quantify the emissions and correlate them to potential health risks. Thus, even if the strategies help minimize exposure to toxic air contaminants, it is impossible on this record to conclude that they reduced the project's potentially significant exacerbating effects to less than significant.[5] We therefore agree with plaintiffs that the EIR failed to evaluate adequately the human health effects of project residents' exposure to mobile source air pollution.

## 2. *Naturally occurring asbestos*

Plaintiffs contend the EIR improperly deferred analysis of emissions related to naturally occurring asbestos. We find the EIR's analysis adequate.

" ' "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind." ' " (*Sacramento Old City, supra*, 229 Cal.App.3d at p. 1019.) An evaluation of the environmental effects of a proposed project need not be exhaustive; the EIR merely needs to include enough detail to enable those who did not participate in its preparation to understand and consider meaningfully the issues raised by the project. (*County of Fresno, supra*, 6 Cal.5th at pp. 515-516.)

---

[5] The City's arguments related to the amount of truck traffic on SR 20/49 and the prevailing winds at the site fare no better. Even if we accept that SR 20/49 carries a very low volume of truck traffic, and that the "predominant" wind direction is away from the project site, there is no way to conclude that the proposed project will not contribute to a significant health risk without an analysis of the human health effects due to the proximity of the project site to SR 20/49.

The EIR identifies asbestos as a toxic air contaminant with the potential to cause adverse health effects in humans, including an increased risk of cancer. The EIR states that activities associated with remediation and development of the site would disrupt the existing soil and have the potential to disrupt naturally occurring asbestos, which the site is known to contain, causing it to become airborne. To mitigate this impact, the EIR provides numerous mitigation measures, including mandatory construction dust control measures and incorporation of NSAQMD rules applicable to dust and airborne asbestos control.

In addition, the EIR requires the project applicant to implement the DTSC-approved RAW and its various components, including its site safety plan and dust mitigation plan. The EIR explains that the dust mitigation plan outlines engineering controls to reduce the risk of release of metals and asbestos fibers into the environment. The EIR notes that the dust mitigation plan reflects industry-standard best practices and the NSAQMD's standard approach to ensure that asbestos is not released where naturally occurring asbestos is likely to be encountered during construction. The EIR also directs readers to the "Hazards and Hazardous Materials" chapter of the EIR, which further explains the measures that will be taken to ensure asbestos does not become an airborne health hazard, including track-out prevention, wetting soil known to contain asbestos or tailings, and suspending all mechanical soil disturbance activities during high winds.

Although the EIR's analysis of naturally occurring asbestos is not perfect, CEQA does not require perfection. (*North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 677; CEQA Guidelines, § 15003, subd. (i).) "[T]he level of analysis in an EIR 'is subject to a rule of reason.' " (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 925.) We find the EIR includes a sufficient degree of analysis to provide decision makers with the information they needed to make an intelligent judgment concerning the project's potential effects related to naturally occurring asbestos.

27

E.       *Noise*

Plaintiffs contend the EIR adopted inappropriate thresholds of significance for construction noise that fail to account for the adverse health impacts that may occur from exposure to elevated noise levels over an extended period.  We conclude that the thresholds of significance applied by the City were adequate to comply with CEQA.

"A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, noncompliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (CEQA Guidelines, § 15064.7, subd. (a).)  In preparing an EIR, the purpose of a threshold of significance is to determine whether a possible significant environmental impact will, in fact, be significant.  (*Protect the Historic Amador Waterways v. Amador Water Agency, supra*, 116 Cal.App.4th at p. 1109.)

A lead agency has "substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular impact."  (*Mission Bay Alliance, supra*, 6 Cal.App.5th at p. 192.)  An agency's choice of a threshold of significance will be upheld if supported by substantial evidence.  (*Id*. at p. 206.)

Here, the EIR derived its significance criteria from appendix G to the CEQA Guidelines.  A leading treatise notes that "[a]lthough Appendix G is designed to function as an initial study checklist for determining whether an EIR is required, many lead agencies use the standards in Appendix G as a basis for defining standards of significance in an EIR."  (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2022-2023) Significant Environmental Effects, § 13.15; CEQA Guidelines, § 15063, subd. (f); see, e.g., *Mission Bay Alliance, supra*, 6 Cal.App.5th at pp. 193-194 [upholding use of appendix G standards for noise analysis]; *Oakland Heritage, supra*, 195 Cal.App.4th at pp. 896-897 [upholding threshold that inquired whether project would

28

expose people or structures to substantial risk of loss, injury, or death because it was effectively coextensive with the CEQA Guidelines].)

As relevant here, the City's EIR states that a noise impact would be considered significant if there would be a "substantial temporary or periodic increase in ambient noise levels in the project vicinity above levels existing without the project." Considered in isolation, this standard is somewhat problematic since it creates a "definitional loop" where an impact is considered "significant" if it is determined to be "substantial." (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 884.) However, the City ultimately adopted a more tailored threshold for construction noise impacts in the final EIR, with the stated goal of "minimiz[ing] the potential for annoyance and avoid[ing] adverse health effects."

In addition, the EIR includes extensive background information to help readers assess the significance of the project's expected noise impacts, including a discussion of typical sound levels measured in the environment, existing ambient noise levels in the vicinity of the project, applicable noise level performance standards, and general guidelines for noise sensitivity. Among other things, the EIR explains that normal speech has a sound level of approximately 60 decibels (dB), that a noisy urban daytime area is about 70 dB, that a diesel truck traveling 50 miles per hour from 50 feet away is about 80 dB, that a gas lawn mower from three feet is about 90 dB, and that physical discomfort to humans begins at above approximately 120 dB. Applying the information in the EIR, a reader reasonably could assess the significance of the project's noise impacts. (*Mission Bay Alliance, supra*, 6 Cal.App.5th at pp. 195-196.)

Moreover, even if we were to conclude the threshold used was inadequate, plaintiffs have failed to show it was prejudicial. Under CEQA, there is no presumption that an error is prejudicial. (§ 21005.) An agency's failure to comply with the law constitutes prejudicial error only if it " 'precludes informed decisionmaking and informed

29

public participation.' " (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)

Here, the EIR projected the increase in ambient noise levels from construction at both the nearest noise receptor (30 feet from the site) and the distance of typical noise receptors (100 feet). The EIR disclosed that the average construction noise levels from the project would be from 68 dBA (A-weighted decibels) to 82 dBA $L_{eq}$ (equivalent continuous sound level), which are up to 27 dB above the ambient daytime noise level restriction for fixed source noise levels, and that the maximum noise levels from the project would be from 78 to 92 dBA $L_{eq}$, up to 37 dB above the daytime noise level restriction. Applying the threshold of significance, the EIR concluded that the construction noise impacts were potentially significant. Thus, the City did not use an inappropriate threshold of significance to avoid a finding of potential significance.

To mitigate the potentially significant impacts, the EIR proposed mitigation measure 9d, which includes construction-related noise requirements, such as requiring stationary equipment to be at least 150 feet from construction zone boundaries, "and/or other measures that are demonstrated to be sufficient to ensure that the maximum noise level at the property boundary would remain at or below 90 dB and increases in hourly noise levels at the property boundary would not exceed 10 dBA above the ambient noise level for two or more hours per day." In essence, the City translated the qualitative threshold into a quantitative maximum threshold of 90 dB, with a two-hour incremental threshold of 10 dBA. Substantial evidence supports the City's conclusion that implementation of the mitigation measures will reduce construction noise to a less-than-significant level. Accordingly, we find no prejudicial abuse of discretion in the EIR's analysis of noise impacts.

F.    *Water supply*

Chapter 14 of the EIR, entitled "Public Services and Utilities," analyzed the project's potential impacts to water supply services. Based on comments from the water

service provider, the Nevada Irrigation District (NID), the EIR identified a district-wide water supply shortfall in single and multiple dry year conditions in 2035 and 2040, a potentially significant cumulative impact. The projected shortfall by year 2035 is up to 469 acre-feet per year (AFY), as compared to a total demand of 203,080 AFY and supply of 202,611 AFY. The projected shortfall by year 2040 is up to 6,910 AFY, as compared to total demand of 209,521 AFY and supply of 202,611 AFY. Nevertheless, the EIR concluded that the project would not substantially contribute to a significant cumulative impact because future water demand would be effectively reduced through additional water conservation efforts.

The EIR describes the effectiveness of the NID's water conservation efforts, with an approximate 18 percent reduction in domestic water use from 2013 through 2018 and a more than 30 percent reduction in per capita water usage in 2015, and notes that the NID would need to achieve only a 3 percent water use reduction to ensure sufficient water supply remains available for the project. Accordingly, the EIR concluded that the project would not result in a cumulatively considerable contribution to the potentially significant cumulative water supply impact.

Plaintiffs argue that the EIR's water supply analysis is inadequate because it (1) fails to demonstrate there is adequate supply to meet future demand; and (2) fails to analyze the likely environmental effects of securing additional water supplies to meet future demand. We disagree.

The EIR relied on existing and recently adopted water conservation plans and standards to conclude that water demand would be reduced adequately to avoid water shortages in future dry years. The EIR also noted that the anticipated water demand from the proposed project would not substantially exceed that assumed under the NID's urban water management plan. There is substantial evidence to support the EIR's conclusion.

The present situation is unlike that in *Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2003) 106 Cal.App.4th 715, 721-722, where the

lead agency relied on illusory "paper water." Here, the EIR properly concluded that, with conservation efforts, there is a reliable water supply, and the proposed project would not alter the water supply and demand projections or make a substantial contribution to any potential water shortages in the cumulative scenario. As a result, there was no requirement for the EIR to discuss possible alternative sources and their impacts. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 432; see *Ocean Street, supra*, 73 Cal.App.5th at pp. 1019-1021 [upholding conclusion that project's contribution was not cumulatively considerable because the project implemented and funded system improvements and conservation measures to reduce water supply demand].) The EIR's water supply analysis was adequate.

G. *Wastewater*

The EIR identified a potentially significant cumulative impact on wastewater infrastructure, but concluded that the project's contribution would not be cumulatively considerable because the project would pay a "fair-share" development fee under the existing wastewater master plan. Plaintiffs contend the EIR's analysis is deficient because the EIR does not demonstrate that the fair-share fee is tied sufficiently to actual mitigation. We are not persuaded.

A lead agency may conclude that a project's contribution to a potentially significant cumulative impact is less than cumulatively considerable if the project is required to implement or fund its fair share of an existing mitigation program designed to alleviate the cumulative impact. (CEQA Guidelines, § 15130, subd. (a)(3); *Save Our Peninsula, supra*, 87 Cal.App.4th at pp. 139-141; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 363; see *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 365 [citing *Save Our Peninsula* with approval].) Such is the case here.

As the EIR explains, the City's wastewater master plan "outlines an improvement plan with alternatives that address the deficiencies of the existing wastewater collection and treatment facilities." The EIR explains that the project would be required by city ordinances to contribute its fair share toward the City's implementation of the wastewater master plan. With this mitigation, the EIR properly concluded that the project's contribution to the potentially significant cumulative impact would not be cumulatively considerable.[6] (CEQA Guidelines, §§ 15130, subd. (a), 15065, subd. (a)(3).)

H.     *Urban decay*

Plaintiffs contend that the EIR violated CEQA because it failed to analyze adequately the project's potential to draw business away from the downtown Grass Valley shopping area and thereby cause business closures and physical deterioration of the downtown area. Plaintiffs argue that "[c]ommon sense" suggests adding more than 100,000 square feet of new retail space would have significant economic impacts on downtown businesses and, as a result, the EIR should have analyzed that impact to determine if it may result in urban decay, either individually or in conjunction with other retail projects. We find no abuse of discretion.

CEQA is concerned with physical changes in the environment; it is not a fair competition statute. (*Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 847; *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1205 (*Bakersfield Citizens*.) Therefore, the economic and social effects of proposed projects are generally "outside CEQA's purview." (*Bakersfield Citizens, supra*, at p. 1205.) "[I]f the forecasted economic or social effects of a proposed project directly or indirectly will lead to adverse physical

---

**6** We grant the City's request for judicial notice of chapter 3.36 of the Grass Valley Municipal Code, which contains regulations pertaining to the sewage collection and treatment improvement fee, cited in the City's opposition brief below. (Evid. Code, §§ 452, subd. (b), 459, subd. (a); § 21167.6.)

changes in the environment, then CEQA requires disclosure and analysis of these resulting physical impacts." (*Ibid*.) "But an economic or social change by itself is not considered a significant effect on the environment. [Citations.]" (*Chico Advocates, supra*, at pp. 847-848; CEQA Guidelines, §§ 15064, subd. (e), 15131, 15382.)

In the EIR for this project, the City considered the potential for the project to cause urban decay in the downtown area. The EIR's analysis is supported by an economic study, attached to the EIR as appendix D. The study evaluates the scale and characteristics of the proposed project in the context of the city and regional retail markets. Based on evaluation of the market area demand and supply projections and project characteristics, the study concludes that the proposed project would help to recapture some of the estimated $150 million in retail sales "leakage" spent outside of Grass Valley, and that the project "would not depend on cannibalizing from existing retail establishments in Grass Valley."

With respect to the downtown business district, the study notes that it serves a "special function" within the City's retail landscape. Marketed to visitors as Grass Valley's "historic, walkable centerpiece," the downtown area is known for its "eclectic mix of locally owned shops and restaurants" in a "concentrated collection of buildings boasting the patina of age." Based on a retail sales analysis, the study concludes that sales activity downtown is most heavily influenced by general economic conditions and factors affecting visitor travel and discretionary spending on entertainment and recreation. After considering the mix of potential tenants for the proposed project and other factors, the study concludes that development of the project "would not change the reasons for shopping and dining Downtown." Because the proposed project was not expected to decrease economic activity in the downtown area, the EIR concluded there was no evidence that the project would lead to urban decay.

Plaintiffs challenge the EIR's conclusion that the project would not take business away from the downtown area and thereby potentially cause business closures. In this

34

context, we do not reweigh the evidence in the record to determine whether the EIR's conclusions are correct. (*Bakersfield Citizens, supra*, 124 Cal.App.4th at p. 1197.) Rather, we review the record in the light most favorable to the City's conclusion to determine whether substantial evidence supports the conclusion that the impact of urban decay is less than significant. (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1183; *Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 514.)

Here, plaintiffs provided no evidence that the project would have significant economic impacts on the downtown area, much less evidence of potential urban decay. (*Placerville Historic Preservation League v. Judicial Council of California* (2017) 16 Cal.App.5th 187, 197 [urban decay is a relatively extreme economic condition; there is no reason to presume urban decay would be a consequence of a project].) In contrast, the record contains substantial evidence that the project would not have significant economic impacts on the downtown area. Accordingly, we conclude the City did not abuse its discretion in concluding that the project would not have any significant urban decay impacts.

I. *Protected plant species*

Plaintiffs argue that the EIR's analysis of protected plant species was flawed because the EIR relied exclusively on certain databases to conclude that special status plant species were not present on the site. Plaintiffs contend this was improper.

Plaintiffs' argument mischaracterizes the record. The EIR did not rely exclusively on databases to conclude that special status plant species were not present on the project site. As the EIR explains, onsite field surveys also were performed to analyze the site and surrounding habitat for special status plant species. Further, although no special status plant species were found during the surveys, the EIR concluded it is possible special status species could become established on site prior to construction. Since removal of special status species is a potentially significant impact, the EIR proposed

35

mitigation measure 6a, requiring a preconstruction survey to be completed to reduce the potential impact to less than significant.

The EIR analyzed adequately the project's potential impacts on special status plant species and the EIR's conclusion of a less-than-significant impact is supported by substantial evidence. (*Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at pp. 1393, 1396-1397 [upholding reliance on biological report based on field study and use of "Natural Diversity Data Base"].)

J.     *Wildfires*

Plaintiffs also complain that the EIR failed to analyze adequately the risk of wildfire. Plaintiffs contend that the EIR's conclusory statement that wildfire is not a risk because the project is not in a "very high fire hazard" area is insufficient to fulfill the informational purposes of CEQA.

The City argues that plaintiffs forfeited the contention by failing to raise it below, and by failing to support it with relevant citations to the record. We agree.

The only mention of the EIR's wildfire risk analysis in plaintiffs' trial brief was in a footnote supporting an argument challenging the statement of overriding considerations. Wildfire risk was not one of the individual impact analyses challenged by plaintiffs; plaintiffs raised that contention for the first time on appeal. In addition, plaintiffs have failed to support the new argument with relevant citations to the record. Accordingly, plaintiffs forfeited their argument concerning the adequacy of the EIR's wildfire risk analysis. (*Family Health Centers of San Diego v. State Dept. of Health Care Services* (2021) 71 Cal.App.5th 88, 98; *Singh v. Lipworth, supra*, 227 Cal.App.4th at p. 817.)

V

*Sufficiency of Findings and Statement of Overriding Considerations*

Plaintiffs also contend that the findings made in support of the statement of overriding considerations are not supported by substantial evidence.

36

"[I]t is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (§ 21002.)  Thus, CEQA prohibits a lead agency from approving a project for which significant effects have been identified unless the agency makes specific findings about alternatives and mitigation measures.  (§ 21081; *Friends of Kings River v. County of Fresno* (2014) 232 Cal.App.4th 105, 120.)  For each significant effect identified in the EIR, the agency must find that (1) the project's significant effects have been mitigated or avoided; (2) the measures necessary to mitigate or avoid the significant effects have been, or should be, adopted by another public agency; or (3) specific economic, social, or other considerations render the alternatives or mitigation measures infeasible.  (§ 21081, subd. (a)(1)-(3); *We Advocate Thorough Environmental Review v. City of Mount Shasta* (2022) 78 Cal.App.5th 629, 640.)

If feasible mitigation measures are not sufficient to render the environmental impact insignificant, the lead agency still may approve the project if it adopts a statement of overriding considerations finding that the project's benefits outweigh its unavoidable adverse effects.  (§ 21081, subd. (b); CEQA Guidelines, §§ 15043, 15093, subd. (a); *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 231.)  All findings must be supported by substantial evidence.  (*Sacramento Old City, supra*, 229 Cal.App.3d at p. 1034; *Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1223, disapproved on other grounds in *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 539; CEQA Guidelines, §§ 15091, subd. (b), 15092, subd. (b), 15093, subd. (b).)

Here, the City made the required findings, explaining how each significant impact would be reduced to less-than-significant levels or why the impact would remain significant and unavoidable.  For the approved project (Alternative B), the only identified significant and unavoidable impact related to GHG emissions.  The findings explained

37

that although mitigation measure 11a would reduce the project's GHG emissions, the project's contribution to GHG emissions would remain a significant and unavoidable impact. Thus, the City adopted a statement of overriding considerations explaining why it determined the project's benefits outweighed its unavoidable significant effect.

Plaintiffs argue that because the analyses of impacts to traffic, air quality, noise, water supply, wastewater, hazardous materials, protected plant species, and wildfires were flawed, the findings made in support of the statement of overriding considerations were equally flawed. In other words, plaintiffs contend the findings are defective because they rely upon faulty impacts analyses.

We conclude plaintiffs have forfeited their challenges to the sufficiency of the evidence by failing to set forth the evidence favorable to the other side and show why it is lacking. (*Tracy First v. City of Tracy, supra*, 177 Cal.App.4th at p. 934.) In any event, since the claims are wholly derivative of plaintiffs' challenges to the EIR's impacts analyses, addressed above, it would serve no purpose for us to reconsider them here.

VI

*Mitigation Monitoring and Reporting Program*

When an agency approves a project subject to mitigation measures, the agency must ensure that the measures are fully enforceable, and the agency must adopt an MMRP to ensure that they are implemented. (§ 21081.6, subds. (a)(1) & (b); CEQA Guidelines, § 15091, subd. (d); *Federation of Hillside & Canyon Associations v. City of Los Angeles, supra*, 83 Cal.App.4th at pp. 1260-1261.)

Plaintiffs contend the City failed to satisfy these requirements because its MMRP lacks any "enforcement mechanisms" to ensure that the mitigation measures will be implemented. We disagree.

In approving the project, the City required that the mitigation measures listed in its MMRP be included as conditions of approval for the project. The MMRP provides that it will be used by City staff to ensure compliance with all mitigation measures identified in

38

the EIR. The MMRP identifies timing and performance evaluation criteria for the mitigation measures, which are, in many cases, tied to the standard plan review, plan approval, and permitting procedures. In addition, the City's Development Code includes procedures to ensure compliance with "any conditions of planning permit or subdivision approval . . . ." Accordingly, we reject plaintiffs' argument that the MMRP lacks sufficient enforcement mechanisms.

DISPOSITION

We have concluded that the EIR prepared by the Agency is an inadequate informational document in that it fails to evaluate adequately the human health effects of residents' exposure to mobile source air pollution. Therefore, we reverse the judgment denying the petition for writ of mandate on this basis. The matter is remanded to the superior court with instructions to vacate its order denying the petition for writ of mandate and enter a new order that grants a petition for writ of mandate directing the City to (1) set aside its certification of the final EIR; (2) set aside the approvals of the project; and (3) correct the deficiencies we have identified in the EIR's analysis of SR 20/49 as a contributor of mobile source emissions and the associated health risks for future project occupants. The order also shall suspend any project activity or activities that could result in an adverse change or alteration to the physical environment until the City has taken the necessary actions to comply with CEQA. (§ 21168.9.) In all other respects, the

judgment is affirmed.  Plaintiffs are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (3).)


    KRAUSE    , J.


We concur:


    HULL    , Acting P. J.


    EARL    , J.